**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION**

```
BREANNA GILL,                   *
                                *
      Plaintiff,                *    CIVIL ACTION NO. 15-00388-B
                                *
vs.                             *
                                *
CAROLYN W. COLVIN,              *
Commissioner of Social          *
Security,                       *
                                *
      Defendant.                *
```

**ORDER**

Plaintiff Breanna Gill (hereinafter "Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security denying her claim for supplemental security income under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, *et seq*.  On June 13, 2016, the parties waived oral argument and consented to have the undersigned conduct any and all proceedings in this case. (Docs. 11, 12).  Thus, the action was referred to the undersigned to conduct all proceedings and order the entry of judgment in accordance with 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73.  Upon careful consideration of the administrative record and the memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner be **AFFIRMED**.

I.   **Procedural History**

Plaintiff filed her application for benefits on April 26,

2012.  (Tr. 182).  Plaintiff alleged that she has been disabled since January 1, 2011, due to "bipolar."  (Id. at 199).

Plaintiff's applications were denied and upon timely request, she was granted an administrative hearing before Administrative Law Judge Vincent P. Intoccia (hereinafter "ALJ") on October 23, 2013.  (Id. at 93).  Plaintiff attended the hearing with her counsel and provided testimony related to her claims.  (Id. at 96).  A vocational expert ("VE") also appeared at the hearing and provided testimony.  (Id. at 107).  On January 31, 2014, the ALJ issued an unfavorable decision finding that Plaintiff is not disabled.  (Id. at 89).  The Appeals Council denied Plaintiff's request for review on June 17, 2015.  (Id. at 1-2).  Therefore, the ALJ's decision dated January 31, 2014, became the final decision of the Commissioner.

Having exhausted her administrative remedies, Plaintiff timely filed the present civil action.  (Doc. 1).  The parties agree that this case is now ripe for judicial review and is properly before this Court pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## II.  Issues on Appeal

1.  **Whether the ALJ erred in giving substantial weight to the opinions of non-examining, State Agency physician, Dr. Harold R. Veits, M.D.?**

> 2. **Whether the ALJ's mental RFC assessment is supported by substantial evidence?**
>
> 3. **Whether the ALJ erred in failing to consider the side effects of Plaintiff's medications?**

## III. Factual Background

Plaintiff was born on January 29, 1993, and was twenty years of age at the time of her administrative hearing on October 23, 2013. (Tr. 93, 96, 195). Plaintiff testified that she dropped out of high school in the ninth grade but is working on her GED. (Id. at 96). Plaintiff last worked as a waitress from July 2010 to January 2011. It is the only job that she has ever had.[1] (Id. at 97, 200, 206).

At her hearing, Plaintiff testified that she is being treated at West Alabama Mental Health Center ("WAMH") for bipolar disorder, for which she takes medication and receives therapy. (Id. at 97-98). Plaintiff testified that she experiences drowsiness as a side effect from Depakote, but it has helped balance and stabilize her mood.[2] (Id. at 100).

Plaintiff testified that her biggest obstacle to working is

---

[1] The vocational expert testified that Plaintiff's past work did not constitute substantial gainful activity. (Tr. 107). Plaintiff testified that she has never received vocational rehabilitation. (Id. at 98).

[2] Plaintiff testified that she takes Depakote at night before she goes to bed, and it causes her to sleep until 1:00 or 2:00 p.m. the next day. In addition, she experiences one hour of grogginess after she wakes. (Tr. 99-100).

that, when she gets around more than three people, she gets nervous; her heart starts racing; her hands start shaking; she feels like she is having a panic attack; and she shuts down. (Id. at 103).   Also, she has trouble concentrating and remembering and cannot watch a two hour movie or read for long periods of time.   (Id. at 104, 106).   Plaintiff testified that she lives with her mom, stepdad and brothers, and that she could not be around people if she worked and, while she could take instructions from a supervisor, she would forget them.   (Id. at 96, 106).

IV.  **Analysis**

    A.  **Standard of Review**

    In reviewing claims brought under the Act, this Court's role is a limited one.   The Court's review is limited to determining 1) whether the decision of the Secretary is supported by substantial evidence and 2) whether the correct legal standards were applied.[3]   Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990).   A court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.   Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).   The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence.   Brown v.

---

[3] This Court's review of the Commissioner's application of legal principles is plenary. Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).

Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991); Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (holding substantial evidence is defined as "more than a scintilla, but less than a preponderance" and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."). In determining whether substantial evidence exists, a court must view the record as a whole, taking into account evidence favorable, as well as unfavorable, to the Commissioner's decision. Chester v. Bowen, 792 F. 2d 129, 131 (11th Cir. 1986); Short v. Apfel, 1999 U.S. Dist. LEXIS 10163, *4 (S.D. Ala. June 14, 1999).

**B.  Discussion**

An individual who applies for Social Security disability benefits must prove his or her disability. 20 C.F.R. §§ 404.1512, 416.912. Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A); see also 20 C.F.R. §§ 404.1505(a), 416.905(a). The Social Security regulations provide a five-step sequential evaluation process for

determining if a claimant has proven his disability.[4]  20 C.F.R.
§§ 404.1520, 416.920.

   In the case *sub judice*, the ALJ determined that Plaintiff
has not engaged in substantial gainful activity since April 24,
2012, the application date, and that she has the severe
impairments of bipolar disorder and obesity.[5]  (Tr. 74).  The ALJ

---

[4] The claimant must first prove that he or she has not engaged in
substantial gainful activity.  The second step requires the
claimant to prove that he or she has a severe impairment or
combination of impairments.  If, at the third step, the claimant
proves that the impairment or combination of impairments meets
or equals a listed impairment, then the claimant is
automatically found disabled regardless of age, education, or
work experience.  If the claimant cannot prevail at the third
step, he or she must proceed to the fourth step where the
claimant must prove an inability to perform their past relevant
work.  Jones v. Bowen, 810 F.2d 1001, 1005 (11th Cir. 1986).  In
evaluating whether the claimant has met this burden, the
examiner must consider the following four factors: (1) objective
medical facts and clinical findings; (2) diagnoses of examining
physicians; (3) evidence of pain; and (4) the claimant's age,
education and work history.  Id.  Once a claimant meets this
burden, it becomes the Commissioner's burden to prove at the
fifth step that the claimant is capable of engaging in another
kind of substantial gainful employment which exists in
significant numbers in the national economy, given the
claimant's residual functional capacity, age, education, and
work history.  Sryock v. Heckler, 764 F.2d 834, 836 (11th Cir.
1985).  If the Commissioner can demonstrate that there are such
jobs the claimant can perform, the claimant must prove inability
to perform those jobs in order to be found disabled.  Jones v.
Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999).  See also Hale v.
Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987) (citing Francis v.
Heckler, 749 F.2d 1562, 1564 (11th Cir. 1985)).

[5] The ALJ also found Plaintiff's hypertension, asthma, and
headaches to be non-severe.  (Tr. 75-76).  Plaintiff has not
raised any issue related to these conditions.  (Doc. 8 at 2; Tr.
75-76, 214).  Therefore, the Court's discussion is limited to
Plaintiff's alleged mental impairments.

further found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals any of the listed impairments contained in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id. at 76).

The ALJ concluded that Plaintiff retains the residual functional capacity (hereinafter "RFC") to perform a range of light work, except that Plaintiff "can frequently balance and can occasionally stoop, knee[l], crouch, crawl and climb ramps or stairs, but she cannot climb ladders, ropes or scaffolds. She should avoid concentrated exposure to extreme cold, extreme heat, wetness, [and] humidity; should avoid concentrated exposure to fumes, odors, dusts, gasses, poor ventilation, etc.; and should avoid all exposure to hazards such as hazardous machinery, unprotected heights, etc.;" she "is able to interact/respond appropriately with supervisors, co-workers, customers, and the general public, but such interaction should be causal and non-confrontational and feedback from supervisors should be supportive;" "she is able to respond appropriately to work pressures in the usual work setting;" "she is able to respond appropriately to changes in routine work settings but such changes should be infrequent and gradually introduced;" "she is able to use judgment in simple 1-2 step work related decisions, but cannot use judgment in detailed or complex work related decisions;" and "she is able to understand, remember,

and carry out simple 1-2 step instructions, but cannot understand, remember, and carry out detailed or complex instructions." (Tr. 78).

The ALJ also determined that while Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms, her statements concerning the intensity, persistence and limiting effects of the alleged symptoms were not credible for the reasons explained in the decision. (Id. at 80).

The ALJ found that Plaintiff has no past relevant work. (Id. at 88). However, utilizing the testimony of a VE, the ALJ concluded that considering Plaintiff's residual functional capacity for a range of light work, as well as her age, education and work experience, there are jobs existing in the national economy that Plaintiff is able to perform, such as "garment sorter," "inserter," and "hand finisher," all of which are classified as light and unskilled. (Id. at 89). Thus, the ALJ concluded that Plaintiff is not disabled. (Id.).

The Court now considers the foregoing in light of the record in this case and the issues on appeal.

1. **Issues**

   a. **Whether the ALJ erred in giving substantial weight to the opinions of non-examining, State Agency physician, Dr. Harold R. Veits, M.D.?**

In this case, Plaintiff argues that the ALJ erred in giving substantial weight to the opinions of non-examining State Agency physician, Dr. Harold R. Veits, M.D., set forth in a Psychiatric Review Technique assessment, while at the same time rejecting the opinions of consultative psychologist, Dr. Donald Blanton, Ph.D. (Doc. 8 at 4, 6; Tr. 115-21, 652). The Commissioner counters that the ALJ afforded the proper weight to the opinions of Dr. Veits and Dr. Blanton that were consistent with the substantial evidence in the case and properly discredited the opinions and findings that were inconsistent with the substantial evidence in the case. (Doc. 9 at 10). Having carefully reviewed the record in this case, the Court agrees that Plaintiff's claim is without merit.

As part of the disability determination process, the ALJ is tasked with weighing the opinions and findings of treating, examining, and non-examining physicians. In reaching a decision, the ALJ must specify the weight given to different medical opinions and the reasons for doing so. See Winschel v. Commissioner of Soc. Sec., 631 F.3d 1176, 1179 (11th Cir. 2011). The failure to do so is reversible error. See Williams v. Astrue, 2009 U.S. Dist. LEXIS 12010, *4, 2009 WL 413541, *1 (M.D. Fla. 2009).

When weighing the opinion of a treating physician, the

ALJ must give the opinions "substantial weight," unless good cause exists for not doing so.  Costigan v. Commissioner, Soc. Sec. Admin., 2015 U.S. App. LEXIS 2827, *10, 2015 WL 795089, *4 (11th Cir. Feb. 26, 2015) (citing Crawford v. Commissioner of Soc. Sec., 363 F.3d 1155, 1160 (11th Cir. 2004) and Broughton v. Heckler, 776 F.2d 960, 962 (11th Cir. 1985)).  The opinion of "a one-time examining physician — or psychologist," on the other hand, is not entitled to the same deference as a treating physician.  Petty v. Astrue, 2010 U.S. Dist. LEXIS 24516, *50, 2010 WL 989605, *14 (N.D. Fla. Feb. 18, 2010) (citing Crawford, 363 F.3d at 1160).  An ALJ is also "required to consider the opinions of non-examining state agency medical and psychological consultants because they 'are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation.'"  Milner v. Barnhart, 275 Fed. Appx. 947, 948 (11th Cir. 2008) (unpublished) (citing 20 C.F.R. § 404.1527(f)(2)(i)).  "The ALJ may rely on opinions of non-examining sources when they do not conflict with those of examining sources."  Id. (citing Edwards v. Sullivan, 937 F.2d 580, 584-85 (11th Cir. 1991)).

Whether considering the opinions of treating, examining, or non-examining physicians, good cause exists to discredit the testimony of *any* medical source when it is contrary to or unsupported by the evidence of record.  Phillips v. Barnhart,

357 F.3d 1232, 1240 (11th Cir. 2004). "Good cause may also exist where a doctor's opinions are merely conclusory, inconsistent with the doctor's medical records, or unsupported by objective medical evidence." Hogan v. Astrue, 2012 U.S. Dist. LEXIS 108512, *8, 2012 WL 3155570, *3 (M.D. Ala. 2012). The ALJ is "free to reject the opinion of any physician when the evidence supports a contrary conclusion." Sryock v. Heckler, 764 F.2d 834, 835 (11th Cir. 1985) (per curiam) (citation omitted); Adamo v. Commissioner of Soc. Sec., 365 Fed. Appx. 209, 212 (11th Cir. 2010) (The ALJ may reject any medical opinion if the evidence supports a contrary finding.).

In the present case, the record shows that that Plaintiff was treated at West Alabama Mental Health (WAMH) for depression/bipolar disorder from approximately December 2007 to January 2014.[6] (Id. at 371-799). On September 22, 2008, Plaintiff was taken to the emergency room at Hillcrest Hospital following a suicide attempt when she was fifteen years old.[7] (Id. at 256). Two days later, she was admitted to Hillcrest

---

[6] From 2004 to 2013, Plaintiff was also treated by her family physician, Dr. Ronnie Chu, M.D., for various physical ailments, as well as bipolar disorder. (Tr. 307-67, 658-71). Dr. Chu routinely refilled Plaintiff's prescriptions for Zyprexa and Depakote and performed routine lab work. (Id. at 315-67, 659-69).

[7] Plaintiff's therapist's notes from WAMH in 2007 and 2008 reflect that she was having problems with school, depression, and self-mutilation. (Tr. 387, 541-50).

Hospital for psychiatric treatment. (Id.). During her hospitalization, Plaintiff reported feeling very depressed and hopeless for approximately two years. (Id. at 256-57). She received group and individual therapy and medication for six days but was discharged against medical advice on September 30, 2008, with the diagnoses of depression, NOS, impulse control disorder, and oppositional defiant disorder.[8] (Id. at 259, 262-63, 264).

Following her hospitalization at Hillcrest, Plaintiff resumed treatment at WAMH. In March of 2010, Plaintiff's therapist discontinued her treatment, noting that Plaintiff had "missed [the] last 4 appointments." (Id. at 459).

On August 4, 2010, at age seventeen, Plaintiff was again admitted for psychiatric evaluation at UAB Hospital because she was talking out of her head, behaving irrationally, and not sleeping.[9] (Id. at 271, 274). Dr. William E. Fialkowski, M.D., performed a mental status examination and noted that Plaintiff reported drinking alcohol socially and smoking marijuana on a nightly basis and that recent stressors included family conflict and her boyfriend being arrested. (Id.).

---

[8] The record shows that Plaintiff's mother took her home against medical advice after Plaintiff was involved in an altercation with another patient on the unit. (Tr. 264).

[9] At that time, Plaintiff reported two previous suicide attempts. (Tr. 271).

While at UAB Hospital, Plaintiff was also treated by Dr. James T. Cullinan, D.O., who diagnosed her with bipolar I disorder and prescribed Zyprexa and Dapakote. (Id. at 274). Dr. Cullinan's notes reflect that Plaintiff was "cheeking" (not being compliant with) her medication. (Id. at 276). As a result, he changed the delivery method of her medication and observed that her manic episodes were gradually beginning to show improvement, with no adverse side effects from the medication. (Id. at 275-76). Dr. Cullinan specifically noted that Plaintiff tolerated her medication well, that she was no longer easily agitated, that she was calm, that her mood was stable, that she was more organized, that her sleep and appetite were improved, that she was less withdrawn and more interactive with her peers, and that she was improving as expected and doing well. (Id. at 276-85). Noting "significant progress," Dr. Cullinan found that Plaintiff's manic/depressive symptoms no longer required hospitalization. (Id. at 277). He discharged Plaintiff in "good" condition on August 17, 2010, after a thirteen-day hospitalization, with instructions to abstain from alcohol and illicit drugs and to follow up with WAMH. (Id. at 276-77).

On August 24, 2010, Plaintiff returned for treatment at WAMH and reported that she was "feeling much better." (Id. at 457). On September 3, 2010, Plaintiff's therapist assessed

Plaintiff has having "no problem" with "ability to work."   (Id. at 402).   From October to December 2010, Plaintiff reported that she was doing well on her medication, that she was coping better, that she had no symptoms of depression, that she was happy, that she was "stable," that she was "doing good," that she was working in a restaurant and that work was "going well," that the medications were helping, that she was eating and sleeping well, and that she was having no problems or side effects with her medications.  (Id. at 451, 619, 621, 623-24).

Plaintiff's alleged onset date in this case is January 1, 2011.  (Id. at 195).   The record reflects that from January to May 2011, Plaintiff's therapist from WAMH regularly noted that Plaintiff's mental status examination was normal, with decreased or no noted anxiety or depression.[10]   (Id. at 444, 447).   From August to November 2011, Plaintiff's mental status evaluations were completely normal with little or no depression, and Plaintiff reported that she was compliant with her medication and "doing fine."   (Id. at 438, 440-42).   In December 2011, Plaintiff's progress was noted as "moderate."  (Id. at 392).

---

[10] In April and May 2011, Plaintiff reported that she was being compliant with her medication and that "she has done well" since her hospitalization in August 2010.  (Tr. 443-44).   Plaintiff did report experiencing sedation as a side effect of her medication.   (Id. at 443).   Plaintiff reported some depression and anxiety but stated that she was working on her GED and had a job but that her "work ha[d] been reduced to one day per week . . . due to slow business."  (Id. at 443-44).

The following year, from January to May 2012,[11] Plaintiff's therapist at WAMH noted generally that Plaintiff was stable, compliant with her medications, "doing fine," and experiencing only one side effect, weight gain, from her medication. (Id. at 421-22, 427, 434, 436). On May 10, 2012, Plaintiff's therapist noted that she "socializes with family and friends" and "reads at her leisure." (Id. at 371-72). From June to September 2012, Plaintiff's therapist noted that Plaintiff was "compliant with meds," "no side effects," "doing well," and that "[s]he reports that meds are working fine," and she is "doing fine." (Id. at 414, 416-17, 701-02, 705, 766). In November 2012, Plaintiff admitted that she was taking her medication "on and off" and reported that, when she was on her medication, she was "doing good" and less depressed, with less mood swings. (Id. at 697).

Plaintiff continued treatment at WAMH in 2013 and in March and April reported being compliant with her medications, "doing good," feeling less sad, having less mood swings, sleeping well, and having no problems to report. (Id. at 686, 691). Her therapist noted that she was "relaxed and open" during her

---

[11] On January 25, 2012, Plaintiff's therapist at WAMH noted that Plaintiff's mental status evaluation was completely normal with no depression. (Tr. 438). The therapist further noted, "[patient] reports stability in today's session and that she has not had a psychotic episode in quite some time." (Id. at 436). Plaintiff's goal was to "meet someone special and begin dating," and she reported that she had met someone and had begun the dating process. (Id.).

session.  (Id. at 686).  However, the following month, Plaintiff reported being off of her medications and being unstable.  (Id. at 684).  From June to September 2013, Plaintiff reported that she was again taking her medication and "doing well," generally sleeping well, not feeling anxious, sad, or depressed, that she was stable, had no thoughts of harming herself, had no symptoms of depression or mania, and was receiving "good report[s]" from her psychiatrist.  (Id. at 673-76, 678, 681-82).  Plaintiff reported that there were days that she was in a bad mood, but she "ha[d] been taking her medications as prescribed," and they "help[ed] her manage her mood swings."  (Id. at 674, 678).

On August 14, 2013, Plaintiff reported that she believed that the medications may have been making her hair fall out.[12] (Id. at 676).  On October 9, 2013, two weeks before her hearing, and in November 2013, after her hearing, Plaintiff reported to her therapist that her sleep and appetite were "good," that she was having no side effects, that she was "doing fine," and that she was staying busy working on her GED.  (Id. at 780, 782, 787).  On November 13, 2013, approximately three weeks after her hearing, Plaintiff reported to her therapist that she had recently moved in with her boyfriend and was excited about her

---

[12] The record shows that from January to August 2013, this is the only side effect that Plaintiff reported.  She regularly and consistently reported no side effects.  (Tr. 724, 726, 731, 741-42, 747).

new home, that she was taking her medications, that she was having no side effects, that her mood had been stable for "the past few weeks," and that her sleep and appetite were "good." (Id. at 787).

In December 2013, Plaintiff continued to report that her mood was stable and euthymic (normal, non-depressed), that her sleep was "good," that she was compliant with her medications, and that she was experiencing no side effects. (Id. at 792, 796). The therapist noted her progress as "good." (Id. at 794). On January 22, 2014, Plaintiff's therapist's notes document a normal examination with reports of no depression and "good sleep," with "no[]" "current side effects." (Id. at 798-99). This is the last treatment note from WAMH in the record.

With respect to the expert evidence in this case, the record shows that, on August 15, 2012, Plaintiff was examined by consultative psychologist, Dr. Donald W. Blanton, Ph.D., at the request of the Agency. (Id. at 652). In his report, Dr. Blanton noted that Plaintiff reported experiencing anxiety, excessive sleep, frequent crying, and fairly significant emotional problems about three days a week. (Id. at 652-54). Plaintiff and her mother also reported that Plaintiff had "highs and low[s]" when she did not "take her medicines correctly," but her problems "dissipated" when she took her medicine; that she was "better now;" that she was "not nearly as confused;" that

she still did not like being around people; and that her medications caused her to sleep twelve to sixteen hours a day. (Id. at 652-53).  Plaintiff and her mother further reported that Plaintiff has no friends, with the exception of a boyfriend, that she does some Facebook and internet activities, that she loves to read, that she does not drink alcohol, and that she has never had a drug or alcohol problem.  (Id. at 653-54). Plaintiff reported that she can shop and handle money and that she cooks and cleans daily, occasionally to the extreme.  (Id. at 654).

    Dr. Blanton's mental status examination revealed that Plaintiff looked sad, that her insight was limited, that she was very restless, that her legs trembled, that she was having some "mild persecutory type fears" and "phobic type fear of social events and driving," and that she was obsessive about relationships.  (Id. at 653).  Dr. Blanton further found that Plaintiff's affect was flat but appropriate; her mood was normal; her energy was normal; her thoughts and conversation were logical; her associations were intact; no confusion was noted; she was alert and oriented to time, place, person, and situation; her memory was consistent with her intellect, which was estimated to be below average; and her judgment was considered fair for work and financial type decisions.  (Id. at 653-54).  Dr. Blanton diagnosed Plaintiff with bipolar I

disorder and opined that she "appears to have ongoing problems with bipolar disorder," and he encouraged her to continue her mental health care. (Id. at 654). Dr. Blanton did not complete a Medical Source Statement, and he assigned no functional limitations as a result of Plaintiff's bipolar disorder.

Two weeks later, on August 30, 2012, non-examining, State Agency psychiatrist, Dr. Harold R. Veits, M.D., completed a Psychiatric Review Technique assessment and opined that Plaintiff had only "mild" restrictions in activities of daily living and "moderate" difficulties in social functioning, concentration, persistence, or pace. (Id. at 116). Dr. Veits also opined that Plaintiff was "not significantly limited" in understanding and remembering short and simple instructions and only "moderately" limited in understanding and remembering detailed instructions. (Id. at 118).

In addition to the foregoing medical evidence, the evidence concerning Plaintiff's activities of daily living shows that Plaintiff lived with her family until she moved in with her boyfriend, that she does housework daily, including washing dishes, mopping, vacuuming, laundry, and cooking; she takes care of several cats and dogs; she shops; she babysits; she fishes; she dates; she drives; she takes care of her own personal care needs; she can count change and handle money; she loves to read books; and she socializes daily with family, plays board games,

talks on the phone, and does Facebook and other internet activities. (Id. at 98, 100-03, 209-13, 654, 787).

As discussed above, Plaintiff argues that the ALJ erred in rejecting the opinions of consultative psychologist Dr. Blanton, while crediting the opinions of non-examining psychiatrist, Dr. Veits. However, a review of the ALJ's decision reveals that he only rejected Dr. Blanton's opinions to the extent that they were inconsistent with the record evidence in the case. (Id. at 83-84). Specifically, the ALJ referred to Dr. Blanton's observations that Plaintiff looked sad, and her affect was flat, while at the same time finding her mood to be "normal." (Id. at 83). Also, Dr. Blanton described Plaintiff as "very restless," while at the same time finding her energy level to be "normal." (Id.). Last, the ALJ noted that, while Dr. Blanton assessed Plaintiff with a GAF score of 50 (indicating serious symptoms), the GAF score reflected Dr. Blanton's assessment of Plaintiff on only one day, and Dr. Blanton did not indicate that Plaintiff had been or could be expected to be impaired for one continuous year or more.[13]  (Id. 83-84).

---

[13] The ALJ further noted that, because a GAF assessment considers factors that are unrelated to a claimant's physical or mental impairments, such as unemployment, financial need, lack of friends, etc., it is an unreliable indicator of a claimant's functioning one year later, and its use has been abandoned in the new Diagnostic and Statistical Manual of Mental Disorders – 5th Edition (DSM-V). (Tr. 83-84).

Having reviewed Dr. Blanton's report at length, the Court finds that the ALJ correctly identified inconsistencies therein. Furthermore, as noted by the ALJ, Dr. Blanton did not assign Plaintiff any functional limitations. In fact, the majority of Dr. Blanton's findings and opinions support the ALJ's RFC assessment that Plaintiff is capable of performing a range of light work, with the stated restrictions.[14]  Thus, Plaintiff's argument that the ALJ erred in rejecting Dr. Blanton's opinions is misplaced.

Plaintiff also argues that the ALJ erred in assigning significant or substantial weight to the opinions of non-examining State Agency psychiatrist, Dr. Harold R. Veits, M.D. As discussed, Dr. Veits opined that Plaintiff had only "mild" restrictions in activities of daily living, "moderate" difficulties in social functioning, concentration, persistence,

---

[14] As discussed, the ALJ's RFC assessment included the following restrictions related to Plaintiff's mental impairments: Plaintiff can perform a range of light work, except that she "is able to interact/respond appropriately with supervisors, co-workers, customers, and the general public, but such interaction should be causal and non-confrontational and feedback from supervisors should be supportive;" "she is able to respond appropriately to work pressures in the usual work setting;" "she is able to respond appropriately to changes in routine work settings but such changes should be infrequent and gradually introduced;" "she is able to use judgment in simple 1-2 step work related decisions, but cannot use judgment in detailed or complex work related decisions;" and "she is able to understand, remember, and carry out simple 1-2 step instructions, but cannot understand, remember, and carry out detailed or complex instructions." (Tr. 78).

or pace, was not significantly limited in understanding and
remembering short and simple instructions, and was only
moderately limited in understanding and remembering detailed
instructions.[15] (Id. at 116, 118). As the ALJ concluded, these
opinions are consistent with the medical evidence in this case,
detailed above, as well as with Dr. Blanton's findings that
Plaintiff's mood and affect were normal, that her thoughts and
conversation were logical, that her associations were intact,
that she had no confusion, that she was alert and oriented, and
that her judgment was considered fair for work and financial
type decisions. (Id. at 653-54). Because Dr. Veits' opinions
did not conflict with any credible finding or opinion of any
examining physician, they were properly given significant
weight.[16] See Milner, 275 Fed. Appx. at 948.

---

[15] Although the ALJ gave substantial weight to the majority of
Dr. Veits' opinions, he rejected Dr. Veits' opinion that
Plaintiff had one or two repeated episodes of decompensation.
The ALJ noted that the two events referenced by Dr. Veits,
namely the two hospitalizations, did not occur during the period
under consideration and did not meet the definition of
"repeated," which requires three events within one year or an
average of once every four months, and only one of the events
met the definition of "extended duration," which requires that
the event last at least two weeks. (Tr. 77, 120).

[16] The Court further notes that, on October 14, 2013, nine days
before Plaintiff's hearing, she was examined by Dr. David W.
Hodo, M.D., at the request of her attorney. Dr. Hodo completed
a Medical Source Opinion Form (Mental) opining that Plaintiff
had marked to extreme limitations in every functional capacity
referred to in the form. (Tr. 769-72). The ALJ rejected Dr.
Hodo's opinion as "so inconsistent with the substantial evidence

Based on the foregoing, the Court finds that Plaintiff's claim that the ALJ erred in assigning substantial weight to the opinions of non-examining physician, Dr. Veits, while rejecting the opinions of consultative psychologist, Dr. Blanton, is without merit.

### b. Whether the ALJ's mental RFC assessment is supported by substantial evidence?

Plaintiff also argues that the ALJ erred in finding that she has the mental residual functional capacity to perform a range of light work, with the stated restrictions, because the ALJ failed to consider the impact of her depression on her functional abilities. (Doc. 8 at 2). According to Plaintiff, the ALJ merely considered her bipolar disorder and did not factor in her depression when determining her mental RFC. The Commissioner counters that the ALJ clearly considered Plaintiff's depression as a component of her bipolar disorder when considering her mental RFC and that substantial evidence supports the ALJ's RFC assessment. (Doc. 9 at 9). Having carefully reviewed the record in this case, the Court finds that

---

and so contradictory of the claimant's reports to her treating sources, her admitted activities of daily living, and the observations of her treating sources as to be entitled to no weight." (Id. at 86). Plaintiff does not mention Dr. Hodo in this appeal and has raised no issue related to his opinions or the ALJ's rejection thereof. Furthermore, based on the evidence set forth above, the Court agrees with the ALJ's assessment of Dr. Hodo's opinions.

Plaintiff's claim is without merit.

Residual functional capacity is a measure of what Plaintiff can do despite his or her credible limitations. See 20 C.F.R. § 404.1545. Determinations of a claimant's residual functional capacity are reserved for the ALJ, and the assessment is to be based upon all the relevant evidence of a claimant's remaining ability to work despite his or her impairments, and must be supported by substantial evidence. See Beech v. Apfel, 100 F. Supp. 2d 1323, 1331 (S.D. Ala. 2000) (citing 20 C.F.R. § 404.1546 and Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997)); Saunders v. Astrue, 2012 U.S. Dist. LEXIS 39571, *10, 2012 WL 997222, *4 (M.D. Ala. March 23, 2012). Once the ALJ has determined the Plaintiff's residual functional capacity, the claimant bears the burden of demonstrating that the ALJ's decision is not supported by substantial evidence. See Flynn v. Heckler, 768 F.2d 1273, 1274 (11th Cir. 1985). Plaintiff has failed to meet her burden in this case.

As the ALJ noted, Plaintiff's treatment providers described her bipolar disorder as being characterized by cycles of mania and depression ("highs and low[s]"). (Tr. 82, 85, 276, 384, 652, 673, 681). The ALJ thoroughly discussed Plaintiff's treatment records and, as he found, the records confirm that Plaintiff's bipolar disorder/depression has been consistently

controlled with medication when she takes it.[17]   (Id. at 295, 414, 416-17, 421-22, 434, 436, 438, 440-42, 444, 457, 619, 652, 673-78, 681-82, 686, 691, 697, 701-02, 705, 766, 780, 782, 787, 792, 796, 799).   Indeed, Plaintiff has shown remarkable improvement while on medication and has consistently had essentially normal examinations when compliant with her medication.   (Id. at 276, 278, 427, 434, 436, 438, 440-42, 444, 447, 450, 457, 468, 619, 623, 652, 701, 741, 782, 794, 796, 798-99).

Moreover, Plaintiff's activities of daily living belie her claim that her bipolar disorder/depression is disabling and that she cannot perform any type of work.   As the ALJ indicated, the evidence concerning Plaintiff's activities of daily living shows that Plaintiff does housework daily, washes dishes, mops, vacuums, does laundry, cooks, takes care of animals, shops, babysits, fishes, dates, drives, takes care of her own personal care needs, handles money, reads books, socializes with family and friends, plays board games, talks on the phone, and does Facebook and other internet activities.   (Id. at 98, 100-03, 209-13, 654).

---

[17] Conversely, Plaintiff reported problems, including depression and instability, when she was off of her medication.   (Tr. 684, 697).

Having reviewed the record at length, the Court finds, as did the ALJ, that Plaintiff's prescribed medications have been largely effective when taken as prescribed.   Indeed, none of Plaintiff's treating or examining medical sources has indicated that her bipolar disorder/depression is debilitating when she is compliant with her medications.   Also, the evidence of Plaintiff's activities of daily living are inconsistent with her allegations that, when on her prescribed medication, she cannot perform any type of work.   The Court finds that nothing in the record contradicts the ALJ's RFC assessment for a range of light work, with the stated restrictions, which accommodate any limitations posed by her mental impairments.

Based on the evidence set forth in detail herein, the Court finds that the substantial evidence in this case supports the ALJ's finding that Plaintiff can perform a range of light work, with the stated restrictions to accommodate her mental limitations.   Accordingly, Plaintiff's claim is without merit.

### c. Whether the ALJ erred in failing to consider the side effects of Plaintiff's medications?

Last, Plaintiff argues that the ALJ erred in failing to adequately consider the sedative side effect of her medications. Specifically, Plaintiff argues that the ALJ ignored evidence that her medications cause her to sleep fourteen to sixteen hours a day and to be groggy the next day.   (Doc. 8 at 6).

26

Having reviewed the record at length, as detailed above, the Court finds that the ALJ did adequately consider Plaintiff's claim that the sedative side effect from her medication was debilitating and that the ALJ properly rejected that claim as unsupported by the substantial evidence in the record. (Tr. 79-80).

As the ALJ found, the evidence of Plaintiff's reports to her treating medical sources that she was experiencing a sedative side effect from her medication is sparse. The Court's review of the record revealed only one such instance. (Id. at 443). In addition to this one report to her therapist at WAMH, Plaintiff reported on one occasion to consultative psychologist Dr. Blanton that she sleeps twelve to sixteen hours a day because of her medication,[18] and she testified at the hearing that her medication makes her "sleep a lot" and that she takes her medicine at night before she goes to bed and does not wake up until 1:00 or 2:00 p.m. the following day. (Id. at 99, 105-06, 653). Notwithstanding these sporadic reports, the record shows that Plaintiff repeatedly reported, when questioned by her treating medical sources about whether she was experiencing side effects from her medication, that her medications were working well and that she was having no side effects. (Id. at 276, 414,

_____

[18] In her Function Report to the Agency, Plaintiff stated that she sleeps fourteen to sixteen hours a day. (Tr. 210).

451, 619, 623, 724, 726, 731, 741-42, 747, 766, 782, 787, 796, 799). Based on the foregoing, the ALJ did not err in finding that the alleged sedative side effect from Plaintiff's medication was unsupported by the substantial evidence in the record. Thus, Plaintiff's claim must fail.

**V.    Conclusion**

For the reasons set forth herein, and upon careful consideration of the administrative record and memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner of Social Security denying Plaintiff's claim for supplemental security income be **AFFIRMED.**

**DONE** this **28th** day of **July, 2016.**

                              **/s/ SONJA F. BIVINS**
                     **UNITED STATES MAGISTRATE JUDGE**